**UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION**

CARLOS BRIGGS,

    Plaintiff,

v.                                      Case No. 13-12583

UNIVERSITY OF DETROIT-MERCY, et al.,

    Defendants.
                                        /

**OPINION AND ORDER GRANTING DEFENDANTS UNIVERSITY OF DETROIT
MERCY AND KERI GAITHER'S MOTION FOR SUMMARY JUDGMENT**

Plaintiff Carlos Briggs, former assistant coach of the University of Detroit Mercy (UDM) men's basketball team, complains that his former boss's boss, UDM's athletic director (Defendant Keri Gaither), accompanied the team on road trips to engage in a sexual relationship with one of Plaintiff's fellow assistant coaches, and that consequently, Gaither granted preferential treatment to her paramour to Plaintiff's detriment. She later admitted the relationship with the other assistant coach, and both were fired. Plaintiff alleges that the relationship created an openly sexually-charged atmosphere—where, for example, players would listen at the door of Gaither's hotel room—thus creating a distasteful work environment.

Plaintiff sued UDM, Gaither, UDM's media consultant, Meisner Associates, Inc., and its President, Mort Meisner. His complaint suggests that his repeated exposure to such salacious and offensive conduct just *must* give rise to some type of Title VII discrimination charge—Plaintiff argues what amounts to "where there's smoke there's fire." That argument turns out to be a fallacious one, however: affirming the

consequent. Fire can indeed cause smoke, but sometimes there is nothing more than smoke, or it is from a different source. Here, the relationship between Gaither and Plaintiff's co-assistant coach, Derek Thomas, may well have given rise to an unprofessional and unpleasant environment, but it does not give rise to a recognized cause of action.

After all Defendants removed the case from Wayne County Circuit Court, on March 3, 2014, Defendants UDM and Gaither moved to dismiss Plaintiff's claims pursuant to Fed. R. Civ. P. 12(b)(6) or in the alternative for summary judgment pursuant to Fed. R. Civ. P. 56.[1] The matter is fully briefed, and no hearing is needed. *See* E.D. Mich. LR 7.1(f)(2). For the following reasons, the court will grant Defendants UDM and Gaither's motion for summary judgment.

## I. BACKGROUND

On July 16, 2007, Plaintiff began his tenure at UDM as one of three assistant coaches for the men's basketball team. (Dkt. # 39, Pg. ID 615.) Shortly thereafter, UDM named Keri Gaither interim athletic director and later, in the spring of 2008, removed the interim designation. (*Ia.* at Pg. ID 615.) In August 2009, Gaither and Derek Thomas, one of the three assistant coaches, began to engage in a sexual relationship. (Dkt. # 30, Pg. ID 616.) Three years later, on August 26, 2012, Plaintiff disclosed his knowledge of Gaither and Thomas's sexual relationship as an

---

[1]Given that both parties rely on exhibits attached to their briefs, this motion will be treated as a motion for summary judgment and disposed of under Rule 56. *See* Fed. R. Civ. P. 12(d) ("If, on a motion under Rule 12(b)(6) or 12(c), matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56.").

"anonymous" reporter via UDM's whistleblower web-based tool.[2] (Dkt. # 50-10). In relevant part, Plaintiff stated:

> I am Assistant Men's Basketball Coach, one of three on our staff. We report to the Head Coach who report to the Athletic Director. The Athletic Director has been having sexual relations with my fellow assistant Derek Thomas since our team trip to Spain in the summer of 2009. I know because Derek and I have been roommates on the road the whole time. Whenever the AD travels with the team I have the room to myself. The favoritism the AD shows Derek has caused a lot of difficulty and drag on our growth as a basketball program. The AD's resentment for me because she knows I know about their affair and because she resents my ability to recruit and do other work functions better than her lover threatens my job status. She has consistently acted to undermine me during the past year.

(Dkt. # 50-10, Pg. ID 1426.)

Steve Nelson, UDM's Associate Vice-President for Human Resources, initially responded thanking Plaintiff for the report, and the next day asked that Plaintiff "provide more details to facilitate the investigation." (Dkt. # 50-10, Pg. ID 1428.) After Plaintiff responded with more details, the following exchange ensued:

> [Nelson]: Please contact Steve Nelson at 313-993-1524.
>
> . . .
>
> [Reporter]: How do I talk to Steve an[d] remain anonymous?

---

[2]UDM's whistleblower policy states:

UDM relies on its employees to perform their duties and responsibilities in accordance with the University's polices and procedures. UDM provides various mechanisms to assist and encourage employees to come forward in good faith with reports or concerns about suspected compliance issues. Employees may report suspected non-compliance issues without fear of reprisal or retaliation. An employee who retaliates against someone who has reported a violation in good faith is subject to discipline up to and including termination of employment.

(Dkt. # 50-9, Pg. ID 1421.)

> . . .
>
> [Nelson]: You have already identified yourself as an Assistant Coach. That narrows it down to two possible people. Your original report said you could submit contact information of others who may know something. I am only trying to determine if there is any additional information pending or if there is possibly someone else that might be able to corroborate your statement.

(*Id.* at Pg. ID 1430.) Ultimately, Plaintiff agreed to meet Nelson at a Tim Horton's restaurant on September 7, 2012 to discuss the report but Nelson did not ascertain any new material facts from this face-to-face meeting. (Dkt. # 50-12, Pg. ID 1488.)

Plaintiff alleges that UDM and Gaither retaliated against him for filing the whistleblower report. As part of UDM's supposed retaliation, the University enlisted Mort Meisner as a consultant and media liaison for its men's basketball program. (Dkt #1-2, Pg ID 16.) On September 7, 2012, the same day that Plaintiff met Nelson at Tim Horton's, Plaintiff alleges that Meisner slandered him to UDM alumnus Michael Korsak. (*Id.*) Specifically, Plaintiff alleges that Meisner told Korsak that: (1) Plaintiff was kicked out of Baylor University, (2) Plaintiff was fired from his previous coaching positions, (3) Plainitff was the cause of UDM's basketball players' dissension, and (4) Plaintiff is a "piece of shit." (*Id.*) Meisner allegedly repeated the first three statements to Detroit Free Press reporter Perry Farell. (*Id.*)

UDM closed its investigation of Plaintiff's whistleblower report on September 15, 2012. (Dkt. # 50-10, Pg. ID 1430.) Three days later, Plaintiff emailed Nelson and carbon copied Dr. Antoine Garibaldi, President of UDM, stating:

4

> The lines of authority have been permanently compromised and those of us working in the department won't have any confidence in the integrity of the lines of authority, the department of the University as long as the wrongdoers are in place. Please tell me if there is anywhere else I can go to get this cleaned up for the good of the University, the Athletic Department, the Men's Basketball Program, our student athletes and each of us who works here doing our jobs blamelessly.

(Dkt. # 39-11, Pg. ID 750.)

Despite Gaither and Thomas's denial of their relationship during the investigation, the truth eventually surfaced and on October 31, 2012, Nelson and Garibaldi informed Gaither and Thomas that UDM would be terminating their employment. (Dkt. # 39, Pg. ID 622.) The following day, Nelson and Garibaldi informed Plaintiff that UDM would also be terminating his employment. (Dkt. # 50, Pg. ID 1233.) Plaintiff's termination letter states "[t]he grounds for the termination are that you acted in a threatening manner toward Mort Meisner and his daughter on the evening of October 12, 2012 at Calihan Hall, and that you attempted to interfere in an employment opportunity that Autumn Rademacher [head coach of the women's basketball team] had at Eastern Michigan University." (Dkt. # 39-9, Pg ID 746.) The letter also explains that although Plaintiff's initial employment letter stated that he could be terminated with or without cause, "[e]ither and both of these grounds are sufficient cause to warrant termination." (*Id.*)

On January 29, 2013, Plaintiff sued UDM, Gaither, Meisner Associates, Inc., and its President, Mort Meisner, alleging that as a result of Gaither and Thomas's sexual relationship he was subjected to a hostile working environment, and that after he disclosed his knowledge of their relationship, Defendants retaliated against him. On May 7, 2014, the court granted Meisner Associates, Inc., and its President, Mort

5

Meisner's renewed motion for summary judgment with respect to Plaintiff's claim for defamation and dismissed Plaintiff's Whistleblower Protection Act claim as to the Meisner Defendants. Pending before the court is Defendants UDM and Gaither's motion for summary judgment.

## II. STANDARD

Summary judgment is proper only when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "In deciding a motion for summary judgment, the court must view the evidence in the light most favorable to the non-moving party, drawing all reasonable inferences in that party's favor." *Sagan v. United States*, 342 F.3d 493, 497 (6th Cir. 2003).

The movant has the initial burden of showing the absence of a genuine dispute as to a material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The burden then shifts to the nonmovant, who must put forth enough evidence to show that there exists "a genuine issue for trial." *Horton v. Potter*, 369 F.3d 906, 909 (6th Cir. 2004) (citing *Matsushita v. Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). Summary judgment, therefore, is not appropriate when "the evidence presents a sufficient disagreement to require submission to a jury." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986).

The existence of a factual dispute alone does not, however, defeat a properly supported motion for summary judgment—the disputed factual issue must be material. A fact is "material" for purposes of summary judgment when proof of that fact would establish or refute an essential element of the claim or a defense advanced by either party. *Kendall v. Hoover Co.*, 751 F.2d 171, 174 (6th Cir. 1984) (citation omitted).

### III.  DISCUSSION

The complaint alleges six counts: (1) violation of Michigan's Whistleblower Protection Act (WPA), (2) retaliation in violation of Michigan public policy, (3) breach of contract as to Defendant UDM, (4) defamation, (5) "bystander" sex harassment and discrimination in violation of Title VII, and (6) retaliation in violation of Title VII.  Each count will be addressed in turn.

### A.  Violation of Michigan's WPA

The WPA prohibits employers from "discharg[ing] . . . an employee . . . because the employee . . . reports or is about to report . . . a violation or a suspected violation of a law or regulation or rule promulgated pursuant to law of this state . . . to a public body."  Mich. Comp. Laws § 15.362.  To establish a claim under the WPA, the plaintiff must show that he "(1) was engaged in protected activity as defined by the [WPA], (2) the plaintiff was discharged, and (3) a causal connection existed between the protected activity and the discharge."  *Shallal v. Catholic Soc. Servs. of Wayne Cnty.*, 566 N.W.2d 571, 574 (Mich. 1997) (citing *Terzano v. Wayne Cnty.*, 549 N.W.2d 606, 608 (Mich. 1996)).  "'Protected activity' under the WPA consists of (1) reporting to a public body a violation of a law, regulation, or rule; (2) being about to report such a violation to a public body; or (3) being asked by a public body to participate in an investigation."  *Chandler v. Dowell Schlumberger Inc.*, 572 N.W.2d 210, 212 (Mich. 1998) (citing Mich. Comp. Laws § 15.362).  For about-to-report claims, an employee must prove by clear and convincing evidence that he, or a person acting on his behalf, was about to report, verbally or in writing, a violation or a suspected violation of Michigan law to a public

body, *see* Mich. Comp. Laws § 15.363(4), and that the person who fired him was objectively aware that he was about to make a report before he was fired. *Kaufman & Payton, P.C. v. Nikkila*, 503 N.W.2d 728, 732 (Mich. Ct. App. 1993).

Plaintiff argues that he engaged in protected activity because he was about to report the sexual relationship between Gaither and Thomas to a public body. Plaintiff points to his September 18, 2012 email to Nelson, on which he carbon copied Garibaldi, expressing his dissatisfaction after UDM closed investigation of Plaintiff's report:

> The lines of authority have been permanently compromised and those of us working in the department won't have any confidence in the integrity of the lines of authority, the department of the University as long as the wrongdoers are in place. *Please tell me if there is anywhere else I can go* to get this cleaned up for the good of the University, the Athletic Department, the Men's Basketball Program, our student athletes and each of us who works here doing our jobs blamelessly.

(Dkt. # 39-11, Pg. ID 750 (emphasis added).) Plaintiff argues that because he had copied President Garibaldi, the highest official at UDM, the email suggested he would go outside the University to report Gaither's sexual relationship with Thomas. This argument is unavailing.

"Please tell me if there is anywhere else I can go" does not demonstrate that Plaintiff was about to report the relationship. The Michigan Supreme Court has explained that an employee who is "about to report" a violation or a suspected violation is one who "is on the verge of" doing so. *Shallal*, 566 N.W.2d at 575. "[T]he language of the Whistleblowers' Protection Act intentionally reduces employee protection the more removed the employee is from reporting to a public body." *Id.* at 576. As Defendants UDM and Gaither convincingly argue, Plaintiff's statement, "Please tell me if there is anywhere else I can go," "is not a threat. It is not a promise to take action.

8

Instead, [it] is merely a question: is there 'anywhere else I can go?'" (Dkt. # 39, Pg. ID 631.) Moreover, even if Nelson took Plaintiff's email to mean that Plaintiff was about to report the relationship to someone outside of UDM, "outside of UDM" is not equivalent to a public body[3] and "the public-body element is the core of the WPA's reporting requirement." *Talhelm v. ABF Freight Sys., Inc.*, 364 F. App'x 176, 182 (6th Cir. 2010). On the basis of Plaintiff's email to Nelson, no reasonable jury could conclude that Plaintiff engaged in protected activity and thus Plaintiff cannot establish a claim under the WPA.

The court will grant Defendants UDM and Gaither's motion for summary judgment with respect to Plaintiff's WPA claim.

### B. Retaliation in Violation of Michigan Public Policy

---

[3]Mich. Comp. Laws § 15.361(d) defines "public body" as any of the following:

(i) A state officer, employee, agency, department, division, bureau, board, commission, council, authority, or other body in the executive branch of state government.

(ii) An agency, board, commission, council, member, or employee of the legislative branch of state government.

(iii) A county, city, township, village, intercounty, intercity, or regional governing body, a council, school district, special district, or municipal corporation, or a board, department, commission, council, agency, or any member or employee thereof.

(iv) Any other body which is created by state or local authority or which is primarily funded by or through state or local authority, or any member or employee of that body.

(v) A law enforcement agency or any member or employee of a law enforcement agency.

(vi) The judiciary and any member or employee of the judiciary.

Plaintiff's written contract states that UDM may terminate his employment "with or without cause" and thus UDM hired Plaintiff as at an at-will employee. (Dkt. # 39-2, Pg. ID # 655.) Nonetheless, under Michigan law, there are three situations in which a discharge is so contrary to public policy as to be actionable: (1) the employee is discharged in violation of an explicit legislative statement prohibiting discharge of employees who act in accordance with a statutory right or duty, (2) the employee is discharged for the failure or refusal to violate the law in the course of employment, and (3) the employee is discharged for exercising a right conferred by a well-established legislative enactment. *Edelberg v. Leco Corp.*, 599 N.W.2d 785, 787 (Mich. Ct. App. 1999) (citing *Suchodolski v. Michigan Consolidated Gas Co.*, 316 N.W.2d 710, 711–12 (Mich. 1982).

In his complaint, Plaintiff cites UDM's whistleblower policy and alleges that "it is contrary to Michigan public policy for an employer to retaliate against an employee in violation of its own rules and policies." (Dkt. # 1-2, Pg. ID 19.) However, even assuming Plaintiff can prove that UDM retaliated against him in violation of its policies (which, as explained in the Title VII retaliation section below, he cannot), this is not one of the three situations where a public policy claim may be maintained. Plaintiff cites *Kimmelman v. Heather Downs Mgmt. Ltd.*, 753 N.W.2d 265 (Mich. 2008), for the proposition that the three scenarios listed above, where a discharged employee may bring a public policy claim, are not the only situations in which a public policy claim may be maintained. However, *Kimmelman* says:

> Our Supreme Court's enumeration of "public policies" that might forbid termination of at-will employees was not phrased as if it was an exhaustive list. However, as a general matter, "the proper exercise of the judicial power

> is to determine from objective legal sources what public policy *is,* and not to simply assert what such policy *ought* to be on the basis of the subjective views of individual judges." *Terrien v. Zwit,* 467 Mich. 56, 66, 648 N.W.2d 602 (2002) (emphasis in original), citing *Marbury v. Madison,* 5 U.S. (1 Cranch) 137, 177, 2 L.Ed. 60 (1803). Consistently with this principle that the courts may only derive public policy from objective sources, our Supreme Court's enumerated "public policies" in the context of wrongful termination all entail an employee exercising a right guaranteed by law, executing a duty required by law, or refraining from violating the law.

*Kimmelman*, 753 N.W.2d at 268. Plaintiff's purported public policy claim does not entail Plaintiff "exercising a right guaranteed by law, executing a duty required by law, or refraining from violating the law." *Id.*

Moreover, in Michigan, "[a] public policy claim is sustainable . . . only where there also is not an applicable statutory prohibition against discharge in retaliation for the conduct at issue." *Dudewicz v. Norris-Schmid, Inc.,* 503 N.W.2d 645, 650 (Mich. 1993), *disapproved on other grounds*, *Brown v. Mayor of Detroit*, 734 N.W.2d 514 (Mich. 2007). Where a statute prohibits the conduct at issue, "Michigan courts have consistently denied a public policy claim." *Id.* Because the WPA specifically prohibits employers from retaliating against employees who report, or were about to report an unlawful practice, Plaintiff cannot bring a claim alleging that UDM and Gaither retaliated against him in violation of public policy for the identical reason. *Allen v. Charter Cnty. of Wayne*, 192 F. App'x 347, 353 (6th Cir. 2006) (citation omitted); *see also Lewandowski v. Nuclear Mgt.*, 724 N.W.2d 718, 723 (Mich. Ct. App. 2006) (citations omitted) ("[A]n employee has no common-law right to avoid termination when he or she reports an employer's violation of the law. In other words, a public-policy claim may only be sustained if there is no applicable statute prohibiting retaliatory discharge for the conduct at issue.").

Perhaps recognizing that existence of the WPA bars his public policy claim, Plaintiff cites *Garavaglia v. Centra, Inc.*, 631, 536 N.W.2d 805, 808 (Mich. 1995), for the proposition that "a breach of public policy may be premised on the alleged violation of a federal statute." Plaintiff supports this contention with just one sentence: "[i]n the instance case, the evidence supports the fact that Briggs was fired for reporting on and opposing Defendants' violation of Title VII." Because he has provided no specific facts to support his claim, Plaintiff has failed to adequately develop this argument and it will be deemed waived. *See McPherson v. Kelsey*, 125 F.3d at 989, 995, 96 (6th Cir.1997) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived. It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to . . . put flesh on its bones."). In addition, the court notes that although a claimant may, in some instances, premise a public policy claim on the alleged violation of a federal statute, Plaintiff does not in the present action. As noted earlier, Plainitff premises his public policy claim on UDM's alleged "violation of its own rules and policies." (Dkt. # 1-2, Pg. ID 19.)

The court will grant Defendants UDM and Gaither's motion for summary judgment as to Plaintiff's public policy claim.

### C. Breach of Contract as to Defendant UDM

Relying on *Toussaint v. Blue Cross and Blue Shield of Michigan*, 292 N.W.2d 880 (Mich. 1980), Plaintiff argues that UDM's whistleblower policy, providing that an employee will not be subject to reprisal or retaliation for making a good-faith report or a violation, created a contractual employment relationship that UDM violated when it terminated Plaintiff. Put differently, Plaintiff argues that UDM's whistleblower policy

created an implied contract of employment terminable only for "just cause," and that UDM discharged him in violation of this just-cause employment contract.

Plaintiff is correct in that a just-cause contract may result from an employee's legitimate expectations grounded in an employer's policy statement published in a manual or handbook. *Id.* at 885. However, the *Toussaint* court clarified the limits of its holding:

> Employers are most assuredly free to enter into employment contracts terminable at will without assigning cause. We hold only that an employer's express agreement to terminate only for cause, or statements of company policy and procedure to that effect, can give rise to rights enforceable in contract.

*Id.* at 890. The opinion further explained that by "requiring prospective employees to acknowledge that they serve[ ] at the will or pleasure of the company" employers can prevent misunderstandings over the term of one's employment. *Id.* at 891. UDM did just that. UDM expressly hired Plaintiff as an at-will employee; Plaintiff's written contract states that UDM may terminate his employment "with or without cause." (Dkt. # 39-2, Pg. ID # 655.) With respect to amendments, the contract also states, "[t]his Agreement may not be amended, supplemented or modified except by a written document signed by both the University and the Assistant Coach." (*Id.* at Pg. ID 657.) The final section of the contract, directly above Plaintiff's signature, states, "[t]his Agreement constitutes the full and complete understandings and agreement of the parties with respect to the employment of the Assistant Coach by the University." (*Id.*) Review of Plaintiff's contract reveals that UDM obtained the acknowledgment that *Toussaint* requires to "prevent misunderstandings" about the existence of an at-will employment contract. As the Sixth Circuit has explained, "[t]hough *Toussaint* holds that there may be an implied

13

contract that employment may be terminated only for good cause, it does not hold that this may be the case where an express contract makes the term of employment at will." *Reid v. Sears, Roebuck & Co.*, 790 F.2d 453, 462 (6th Cir. 1986) . Furthermore, under Michigan law, an implied contract cannot be enforced where an express contract is in effect between the parties covering the same subject matter. *Id.* (*citing Steele v. Cold Heading Co.*, 203, 336 N.W.2d 1, 2 (Mich. Ct. App. 1983); *In re DeHaans Estate*, 134 N.W. 983, 984 (Mich. 1912)). Plaintiff's argument that UDM's whistleblower policy created an implied contract of employment terminable only for "just cause" fails.

The court will grant Defendants UDM and Gaither's motion for summary judgment with respect to Plaintiff's breach of contract claim.

### D. Defamation

Plaintiff alleges that Mort Meisner defamed him and seeks to hold UDM and Gaither responsible under a *respondeat superior* theory. UDM and Gaither counter that they cannot be held liable for the supposed intentional tort of an independent contractor. Plaintiff does not directly dispute Defendants UDM and Gaither's characterization of Meisner as an independent contractor but instead cites *Nichol v. Billot*, 279 N.W.2d 761 (Mich. 1979), and argues that an independent contractor is an employee for purposes of *respondeat superior* liability where the employer has exercised "a degree of control inconsistent with independent contractor status." *Id.* at 764.

The dispute over Meisner's status as an independent contractor is moot. In its August 28, 2013 order, the court concluded that Meisner's alleged statement that Plaintiff is a "piece of sh*t" is one of opinion and therefore not defamatory. (Dkt. # 24.) Approximately eight months later, on May 7, 2014, the court determined that the other

three alleged statements are also not defamatory because Plaintiff is a limited-purpose public figure and did not prove that Meisner acted with actual malice. (Dkt. # 57.) Because the court has already determined that Meisner's alleged statements are not defamatory, the question of whether Defendants Gaither and UDM can be held liable for Meisner's alleged defamation of Plaintiff is moot.

The court will grant Defendants UDM and Gaither's motion for summary judgment as to Plaintiff's defamation claim.

### E. "Bystander" Sex Harassment/Discrimination in Violation of Title VII

Title VII makes it an "unlawful employment practice for an employer . . . to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex." 42 U.S.C. § 2000e-2(a). It is unclear if Plaintiff is alleging a claim for Title VII sex discrimination, a claim for Title VII sexual harassment, or both. Regardless, to establish a *prima facie* case under Title VII of sex discrimination or sexual harassment, Plaintiff must prove that he is a member of a protected class. *See Humenny v. Genex Corp.*, 390 F.3d 901, 906 (6th Cir.2004) (discrimination); *Bowman v. Shawnee State Univ.*, 220 F.3d 456, 462-63 (6th Cir. 2000) (harassment)[4]. He cannot and thus his claims fails.

Plaintiff argues that Gaither granted preferential treatment to Thomas on the basis of Gaither and Thomas's sexual relationship, thereby discriminating against him

---

[4]There are two types of Title VII sexual harassment claims. If a plaintiff cannot show that the sexual harassment was "severe or pervasive," the plaintiff may nonetheless make a claim of *quid pro quo* harassment. *Bowman v. Shawnee State Univ.*, 220 F.3d 456 (6th Cir. 2000). To prevail on either type of sexual harassment claim, a plaintiff must prove that he is a member of a protected class.

and subjecting him to a "sexually harassing environment." (Dkt. # 50, Pg. ID 1236.) However, "when a supervisor gives favorable treatment to [her] paramour, every other employee 'with whom [s]he is not having sex' experiences the resultant discrimination or harassment, regardless of their gender." *Sherk v. Adesa Atlanta, LLC*, 432 F. Supp. 2d 1358, 1371 (N.D. Ga. 2006) (citations omitted). The favoritism "is not based on sexism (whether gender or activity), but is rather more akin to nepotism." *Ayers v. Am. Tel. & Tel. Co.*, 826 F. Supp. 443, 445 (S.D. Fla. 1993). Unfortunately for Plaintiff's argument, those who were not engaged in a sexual relationship with Gaither are not a protected class under Title VII. *See Schobert v. Ill. Dep't of Transp.*, 304 F.3d 725, 733 (7th Cir. 2002) ("Whether the employer grants employment perks to an employee because she is a protegé, an old friend, a close relative or a love interest, that special treatment is permissible [under Title VII] as long as it is not based on an impermissible classification"); *Taken v. Okla. Corp. Comm'n*, 125 F.3d 1366, 1370 (10th Cir. 1997) ("Favoritism, unfair treatment and unwise business decisions do not violate Title VII unless based on a prohibited classification."). Because Plaintiff cannot prove that he is a member of a protected class, his claims for sex discrimination and sexual harassment under Title VII fail.

The court's conclusion is aligned with the majority of other courts throughout the country. As our sister court has stated, "[a]lthough the Sixth Circuit has not yet addressed the issue, the federal courts that have addressed discrimination claims premised on preferential treatment for a consensual romantic partner have [almost] uniformly concluded that favorable treatment for a paramour does not constitute unlawful gender discrimination." *Stanley v. Insights Training Grp., LLC*, No. 3:09-CV-

16

00231, 2013 WL 76123, at *6 (W.D. Ky. Jan. 4, 2013) (citations omitted); *see also Mair v. Napolitano*, No. 1:10-CV-47, 2011 WL 6209799, at *4 (W.D. Mich. Dec. 14, 2011) (citations omitted) ("[A] supervisor's preferential treatment of a paramour . . . [does not] constitute discrimination under [Title VII]."); *Womack v. Runyon*, 147 F.3d 1298, 1300 (11th Cir. 1998) (per curiam) (agreeing with the defendant that "Title VII does not encompass a claim based on favoritism shown to a supervisor's paramour"); *DeCintio v. Westchester Cnty. Med. Ctr.*, 807 F.2d 304, 308 (2d Cir. 1986) (holding that Title VII is not implicated where favoritism occurs on behalf of a consensual sexual partner). In light of this legal landscape, to support his argument that he can raise his Title VII discrimination and harassment claims even though he is not a member of a protected class, Plaintiff relies on just one case: *Broderick v. Ruder*, 685 F. Supp. 1269 (D.D.C. 1988). However, the D.C. Circuit appears to be the only circuit in which such a claim is cognizable. *E. v. Dixie Yarns, Inc.*, No. 2:93CV00267, 1994 WL 872892, at *2 (M.D.N.C. Dec. 9, 1994). The court sees no reason to deviate from the vast majority of courts' conclusions that favoritism of a paramour does not violate Title VII. Although Gaither's (alleged) preferential treatment may have been newsworthy, distasteful, or unfair, it is not the court's role to "sit as a super-personnel department." *Saulsberry v. Fed. Exp. Corp.*, No.13-5345, 2014 WL 103564, at *5 (6th Cir. Jan. 10, 2014) (citation omitted).

      The court will grant Defendants UDM and Gaither's motion for summary judgment with respect to Plaintiff's Title VII claims for sex discrimination and sexual harassment.

**F.  Retaliation in Violation of Title VII**

To establish a *prima facie* claim for retaliation, a plaintiff must show that: "(1) she engaged in activity protected by Title VII; (2) this exercise of protected rights was known to the defendant; (3) the defendant thereafter took an adverse employment action against the plaintiff; and (4) there was a causal connection between the protected activity and the adverse employment action." *Martin v. Toledo Cardiology Consultants, Inc.*, 548 F.3d 405, 412 (6th Cir. 2008).  In his complaint, Plaintiff alleges that after he reported the sexual relationship between Gaither and Thomas, Defendants UDM and Gaither retaliated against him.  Defendants UDM and Gaither argue that Plaintiff cannot make out a *prima facie* case of retaliation because he cannot establish that he engaged in protected activity or that there was a causal connection between the protected activity and the adverse employment action.  Plaintiff did not discuss his Title VII retaliation claim in his response.  By failing to present any argument or evidence supporting his Title VII retaliation claim in his response, he has forfeited any argument that summary judgment on that claim is inappropriate.  *See Brown v. Gojcaj Foods, Inc.*, No. 09–14537, 2011 WL 1980533, at *3 (E.D. Mich. May 20, 2011) ("If a party fails to respond to an argument raised in a motion the court can assume that opposition to the motion is waived and the motion may be granted." (citing *Humphrey v. U.S. Attorney Gen.'s Office*, 279 F. App'x 328, 331 (6th Cir. 2008))).  Nonetheless, because it relates directly to the preceding section, the court will briefly address Defendants UDM and Gaither's argument that Plaintiff did not engage in protected activity.

Opposing conduct made unlawful by Title VII or participating in an investigation, proceeding, or hearing under Title VII constitutes protected activity.  42 U.S.C.

§ 2000e–3(a). Because, as the court concluded in the previous section, Defendants UDM and Gaither did not violate Title VII, Plaintiff did not report conduct unlawful under Title VII. Regardless, protected activity includes "opposing any practice that the employee reasonably believes to be a violation of Title VII . . . whether or not the challenged practice ultimately is found to be unlawful." *Simpson v. Vanderbilt Univ.*, 359 F. App'x 562, 570–71 (6th Cir. 2009) *(citing Johnson v. Univ. of Cincinnati,* 215 F.3d 561, 579-80 (6th Cir. 2000). The question is thus not whether the activity Plaintiff opposed violated Title VII, but whether Plaintiff had a reasonable and good faith belief that he was reporting conduct unlawful under Title VII.

No reasonable jury could find that when Plaintiff reported Gaither and Thomas's relationship, and the resulting favoritism of Thomas, he had a reasonable and good faith belief that he was reporting Title VII sex discrimination or sexual harassment. Nothing about the favoritism Plaintiff complained of in his whistleblower report had to do with a protected characteristic:

> I am Assistant Men's Basketball Coach, one of three on our staff. We report to the Head Coach who report to the Athletic Director. The Athletic Director has been having sexual relations with my fellow assistant Derek Thomas since our team trip to Spain in the summer of 2009. I know because Derek and I have been roommates on the road the whole time. Whenever the AD travels with the team I have the room to myself. The favoritism the AD shows Derek has caused a lot of difficulty and drag on our growth as a basketball program. The AD's resentment for me because she knows I know about their affair and because she resents my ability to recruit and do other work functions better than her lover threatens my job status. She has consistently acted to undermine me during the past year.

(Dkt. # 50-10, Pg. ID 1426.) Plaintiff's whistleblower complaint never mentioned anything about his, or anyone else's, gender (or sex). *See, e.g., Krasner v. HSH Nordbank AG*, 680 F. Supp. 2d 502, 520 (S.D.N.Y. 2010). Moreover, as *Stanley* noted,

19

"[a]s far as this court is aware, every other court to have considered the issue has found that a plaintiff who expressed opposition to favoritism resulting from a consensual affair did not have a reasonable basis to believe he or she was opposing an unlawful practice." *Stanley*, 2013 WL 76123 at *7 (collecting cases). Even if Plaintiff had not forfeited his retaliation claim, it would fail on the merits because he did not engage in any activity protected by Title VII.

The court will grant Defendants UDM and Gaither's motion for summary judgment as to Plaintiff's Title VII retaliation claim.

## IV.  CONCLUSION

IT IS ORDERED that Defendants UDM and Gaither's motion for summary judgment [Dkt. # 39] is GRANTED.

      s/Robert H. Cleland
ROBERT H. CLELAND
UNITED STATES DISTRICT JUDGE

Dated:  May 27, 2014

I hereby certify that a copy of the foregoing document was mailed to counsel of record on this date, May 27, 2014, by electronic and/or ordinary mail.

      s/Lisa Wagner
Case Manager and Deputy Clerk
(313) 234-5522